IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 1, 2021

## IN RE PAYTON G.[1] ET AL.

**Appeal from the Juvenile Court for Hamilton County**
**No. 289100, 289101        Robert D. Philyaw, Judge**

_____

### No. E2020-00992-COA-R3-PT

_____

The mother of two minor children appeals the termination of her parental rights. The trial court terminated the mother's parental rights upon finding that the Department of Children's Services established three grounds for termination: (1) abandonment prior to incarceration that exhibits wanton disregard for the welfare of the children; (2) substantial noncompliance with a permanency plan; and (3) failure to manifest an ability or willingness to assume custody, and that termination was in the best interest of the children. This appeal followed. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the court, in which JOHN W. MCCLARTY and ARNOLD B. GOLDIN, JJ., joined.

Rex V. Sparks, Chattanooga, Tennessee, for the appellant, Dana G.

Herbert H. Slatery, III, Attorney General and Reporter, and Lexie A. Ward, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

### OPINION

#### FACTUAL AND PROCEDURAL HISTORY

This case concerns the parental rights of Dana G. ("Mother") to her children Payton G. (born in 2005) and Aidan G. (born in 2007) (collectively, "the Children"). Mother divorced the Children's father, Michael G. ("Father"), on May 14, 2008. The Order of Divorce and the incorporated agreed Permanent Parenting Plan, named Father the primary

_____

[1] This Court has a policy of protecting the identity of children by initializing the last names of the parties.

residential parent of the Children, awarded 80 days of visitation to Mother and stipulated, "Parenting time supervised until mother has a place for the children to have their own room. No alcohol while mother is exercising visitation with children." As a consequence, Payton and Aidan resided with Father following their parents' divorce in 2008.

Payton and Aidan had a half-sister, a daughter of Father, who was born within six months of Payton. The half-sister's mother died in 2010, following which she resided with Payton, Aidan, and Father. They resided together until March 2, 2017, when the three children were removed pursuant to an *ex parte* protective custody order issued by the Hamilton County Juvenile Court at the request of the Tennessee Department of Children's Services ("DCS"). Their removal resulted from a referral DCS received on February 22, 2017, with allegations of sexual and physical abuse by Father. Following an investigation, DCS filed a dependency and neglect petition, and the *ex parte* protective custody order was issued and served on March 2, 2017.[2]

At the adjudicatory hearing on May 11, 2017, evidence was introduced which established that Father had sexually abused Payton's and Aidan's half-sister. Additionally, Mother testified that she had been emotionally and physically abused by Father and stated that Payton had told her that he did not want to return to Father's home. The court found "that it [wa]s unclear why [Mother] was not extremely fearful for her children's safety in their father's care, knowing his history of abuse towards her . . . [and] why she was unable to take effective action to protect her children." The trial court did not place the Children with Mother because she "ha[d] a history of drug use, including prior arrests related to illegal drug use…" and she had "prior CPS history with [DCS]," citing Mother's 2015 arrest on drug-related charges while at a motel with Payton present. Cassandra Leonor, DCS Case Manager, testified that Mother stated that she had not used any drugs recently but refused to submit to a drug screen. The court ordered Mother to submit to a random drug screen and hair follicle test through DCS and that she "accept[] some responsibility for what has happened to her children prior to entering DCS custody."

Following the conclusion of the adjudicatory hearing, Payton, Aidan, and their half-sister were adjudicated dependent and neglected based on Father's abuse of the half-sister, and DCS was awarded legal custody of all three children. Payton and Aidan were placed in a foster home because DCS determined that Mother was not a suitable placement due to prior substantiated allegations of a drug-exposed child and lack of supervision related to Payton. Because the mother of the half-sister was deceased, the half-sister was also placed in foster care at the same foster home with Payton and Aidan.

---

[2] DCS filed an amended petition on April 11, asking the court to find all three children dependent and neglected and to award temporary legal custody to DCS, and Father did not contest DCS's petition for temporary custody of his three children.

The court approved two Permanency Plans: the first on March 22, 2017, and the second on October 18, 2018.[3] Each set forth the responsibilities between Mother, the agency and the caseworkers, with a goal of, *inter alia*, attaining a safe, suitable and permanent living situation for Payton and Aidan. *See* Tenn. Code Ann. § 37-2-403(2)(A).

Pursuant to each plan, Mother was required to do the following: participate in family therapy if requested; attend and complete a parenting assessment and follow all recommendations; participate in an alcohol and drug assessment and follow all recommendations; submit to random drug screens; obtain a sober sponsor; avoid association with those known to use or abuse illegal substances, alcohol, or non-prescribed medications; obtain a mental health assessment and follow all recommendations; provide DCS with proof of housing and maintain residential stability; provide DCS a copy of a valid driver's license, proof of car insurance, and vehicle registration, or a transportation plan; provide proof of legal income; pay child support as ordered; maintain contact with case workers and notify them of any changes of circumstances within twenty-four hours; sign all required releases for DCS to ensure proper case management; attend Child and Family Team Meetings ("CFTM") and court hearings as requested; attend educational meetings and medical appointments for the Children; participate in visitation in a positive manner to aid in the reunification process; and contact DCS regarding any visitation issues that arise.

After attempting to assist Mother for eight months, DCS filed a petition in the Hamilton County Juvenile Court on July 1, 2019, to terminate Mother's parental rights to the Children, citing the grounds of substantial noncompliance with the permanency plan, abandonment by incarcerated parent, and failure to manifest an ability and willingness to personally assume legal and physical custody of the children.[4]

The court held a trial on the petition on November 14, 2019, January 29, 2020, and July 17, 2020.[5] The evidence presented at trial revealed that Mother has a history of illegal

---

[3] The permanency plans only pertained to Payton and Aidan, not their half-sister, because Mother was neither a parent or custodian of their half-sister. For the same reason, the petition to terminate Mother's parental rights only pertained to Payton and Aidan. DCS filed a separate petition to terminate the parental rights of Father to their half-sister.

[4] The petition also sought to terminate Father's parental rights to Payton and Aidan. Father surrendered his parental rights to Payton and Aidan on July 31, 2018; thus, Father is not a party to this appeal.

[5] Mother attended and testified the first day of trial; however, she expressed anxiety and stated that she could not continue, so the court paused her testimony and moved on to another witness. Mother did not attend the second day of trial and sent an email to her counsel informing him she had the flu. On the third day of trial, Mother appeared via video call due to COVID-19 protocol; however, after a few questions, Mother disconnected from the video call and did not respond to any contact numbers. The court was unable to reach her through email or through 32 phone calls.

drug use, which was substantiated by both drug screenings and Mother's statements during drug and alcohol assessments. It was also established that Mother's drug use led to arrests and criminal convictions, including an arrest in February 2019 in the presence of the Children while at the juvenile court awaiting a hearing. Mother pled guilty to two misdemeanor offenses—possession of a schedule VI drug and possession of drug paraphernalia—and was incarcerated from April 15 to June 6, 2019, with the remainder of the 11-month, 29-day sentence on supervised probation.

Mother tested positive for illicit substances multiple times. She tested positive for THC (marijuana) on June 27, 2017; for methamphetamine, amphetamine, and THC on March 1, 2018, and on October 25, 2018; and for THC on October 7, 2019. On other occasions, Mother refused to comply with drug screening. She completed an alcohol and drug assessment at Health Connect on July 24, 2017, which resulted in a diagnosis of severe cannabis use disorder, generalized anxiety disorder with panic attacks, and unspecified trauma and stressor-related disorder. The assessor recommended that Mother participate in intensive outpatient treatment to address both mental health issues and substance abuse, as well as parenting classes "to increase her awareness of the impacts of substance use and trauma on childhood development." This assessment did not address methamphetamine use, and because Mother tested positive for methamphetamines in March and October of 2018, DCS asked for a second alcohol and drug assessment.[6]

Mother completed the second drug and alcohol assessment at Susannah's House on July 25, 2019. The assessment report noted that Mother had a history of "ongoing use of sedatives, hypnotics, or tranquilizers for a period of one year," "ongoing or problematic cocaine use for a period of one year," "a 20-year history of ongoing, regular cannabis use," "a one-year history of using multiple substances on an ongoing basis," and a history of serious problems with depression and anxiety. The report further stated that "[Mother] admits marijuana being her current [drug of choice] with periods of use of cocaine, molly, and alcohol to intoxication." The recommendations section stated Mother has "a profound drug problem," "a profound legal problem," and "a profound psychological or emotional problem," and that for all of these, "help obtaining appropriate treatment is absolutely necessary and should be prioritized." Based on this assessment, Mother was to return to Susannah's House for the orientation and to participate in the treatment program. Stacey Ridgell, the Children's DCS case worker, received texts from Mother stating she was participating in the intensive outpatient program there. However, when Ms. Ridgell followed up with Susannah's House, she was informed that Mother had only completed the original intake and had not returned for orientation or treatment. Moreover, Mother

---

[6] Notwithstanding her positive methamphetamine screens, Mother denied using the substance. Mother appeared to believe that DCS tampered with her drug screening tests; she told Ms. Ridgell, "If it's positive for meth, you guys did it." She also interrupted Ms. Ridgell's testimony at the permanency hearing to say, "I don't use meth."

did not attend AA or NA meetings and did not have a sober sponsor, as required by the permanency plan.[7] Mother repeatedly told Ms. Ridgell she was getting treatment, but DCS was unable to confirm it, and Mother provided no documentation to substantiate her claims.

Ms. Ridgell provided Mother with a list of resources to participate in parenting classes, but there is no evidence that she ever completed this task. On October 18, 2019, Mother emailed enrollment information for an online parenting course and a 12-week online alcohol and drug course to Ms. Ridgell. When Ms. Ridgell followed up on Mother's progress one month later, Mother had completed 30 minutes of the alcohol and drug component and none of the parenting course. When Ms. Ridgell transferred the case to another case worker in January 2020, she had not received any documentation either from Mother or the online provider that Mother had actually completed the programs. The subsequent case worker, TaQuesha Brandon, testified that she likewise received no verification that Mother completed either program.

Mother failed to maintain suitable housing for the Children. In March 2018, Mother provided DCS with a lease she signed on an apartment in Knoxville. When Ms. Ridgell visited the home, she found it in an unsuitable condition for the children because there were no beds for the Children, and there was debris and little food. On some subsequent visits, Mother did not permit Ms. Ridgell to enter the home. On July 19, 2018, Mother did not permit Ms. Ridgell to go beyond the living room, and on July 28, 2019, when Ms. Ridgell went to the home to pick Mother up for a court hearing, Mother said, "I can't let you in." When Ms. Ridgell was able to enter the home in October of 2019, she determined that the home was "not quite ready yet for the [Children], but it was much improved." Mother testified that she lived in that apartment in Knoxville for four years but had recently moved to Maryville, where she was living with her boyfriend of ten years, Tyler M. Mother acknowledged that she had not provided DCS with notice of her change in living arrangements, as required by the permanency plan. When asked whether Tyler M. used drugs, she testified that he had been sober since 2015 and that he is drug tested often for his job.

Mother missed or was late to scheduled visits on several occasions, which she claimed was due to difficulty with transportation. She claimed she was unable to visit the children regularly because she did not have a driver's license and the Children were in foster care an hour away from where she lived. Ms. Ridgell offered to give Mother bus passes and gas cards, but Mother was required to produce evidence that she still lived at her reported address to acquire the cards, and Mother never provided that information.

Mother's last visit with the Children was in January 2019. In early March 2019,

---

[7] Mother asserts in her brief that she "had . . . a [sober] sponsor and reported it to the DCS case manager November 21, 2017." However, Mother testified on the last day of trial, "I don't have a sober sponsor."

Omni Community Health workers—who were serving as both resource coordinators and clinical therapists in this case—received a text message from Mother, who had just been released from jail, stating she would no longer visit the children because she believed DCS was using visitation as an opportunity to arrest her again. Yet, Mother contacted Ms. Ridgell in April asking why visitation was suspended. Ms. Ridgell informed Mother that she could, according to the court's instructions, resume visitation if she met with and gained the approval of the Guardian ad Litem, but Mother never committed to a meeting, citing conflicts with her work and other reasons. In October, Mother participated in a CFTM in which it was unanimously decided that visitation would not be reinstated considering the pending termination hearings to avoid a traumatic experience for the children.

Mother did not maintain regular communication with DCS case workers. DCS has three phone numbers for Mother but often could not reach or get a response from her. In August of 2018, Mother told Ms. Ridgell that she wanted to communicate only via text message or email for her "personal safety." Even so, when Ms. Ridgell texted or emailed Mother the dates and times of CFTM meetings, Mother usually did not reply or attend the meetings.

With regard to financially supporting her children, the divorce decree issued by the Hamilton County Circuit Court required Mother to pay $100 per month in child support, representing $50 per month for each child. On May 1, 2018, the circuit court determined that Mother had failed to pay child support as required from February 2017 through April 2018 and entered an arrearage judgment against her for $1,400, representing $700 for each child. When the termination petition went to trial, the evidence established that since May 1, 2018, Mother had made only two support payments, both by garnishment: $1,150.00 on March 8, 2019, and $25.38 on April 5, 2019. Mother disputed this fact claiming she was "caught up" due to garnishment of her wages; however, she provided no documentary evidence to support her claim. Contrary to Mother's claims, the evidence revealed that she had an arrearage of more than $1,800, representing a year and a half of unpaid child support.

As for Mother's employment history, Ms. Ridgell stated that Mother would get jobs but "has . . . no history of maintaining the job." For example, Mother reported working at a Tennessee Tavern, but "within a matter of a couple of months," Ms. Ridgell was informed that Mother was no longer employed there and was not eligible for rehire. Mother also informed Ms. Ridgell she was employed at a liquor store in Knoxville, but when Ms. Ridgell visited, she was informed that Mother did not work there. At the time of trial, Mother was employed at Applebee's and Moe's Southwest Grill, although her job at Moe's was unstable because she had already been terminated and then reinstated by Moe's.

Two Omni Community Health professionals testified regarding the Children's mental and physical health and needs. Ami McPherson, a clinical therapist with Omni

Community Health, testified that Payton, who was diagnosed with autism, was initially placed in a foster home but was moved to Norris Academy, a residential treatment center that focuses on autism care. She further testified that just before entering the Academy, Payton made threats of harm to his foster parents and their toddler son, and he required constant supervision as he was predisposed to run away in the middle of the night.

Ms. McPherson testified that she worked with Payton for about six months (until his transfer to Norris Academy) in therapy to help with impulse control, emotional regulation, and dealing with trauma. During her time with him, Ms. McPherson did not see significant improvement with Payton and was focused on getting him stabilized. Payton continued to receive individual counseling at Norris Academy. By trial, he was ready to relocate to a less restrictive placement, and DCS was looking for a good foster placement for him.

With regard to Aidan, Ms. McPherson testified that she worked with him for a year, with a focus on impulse control, emotional regulation, and dealing with trauma. She explained that Aidan had made progress and that his strengths were passion, his happy demeanor, and that he was motivated at school, but he had a lot of grief and trauma related to this case.

Omni Visions Resource Coordinator Shatera Simmons testified that she had worked with Aidan since March 2019. She stated that Aidan was diagnosed with ADHD, he has nightmares that cause him to scream in his sleep, and he takes medication to address both issues. She stated that he attends Comprehensive Child and Family Treatment (CCFT) two to three times a week and has the ability to make good grades, is motivated, shows empathy for others, and is "really, really smart."

Aidan's case worker, TaQuesha Brandon, testified that Aidan was in a pre-adoptive home and doing well in that placement; however, Ms. McPherson and Ms. Simmons noted recent regression in Aidan's behavior and stated that he had behavior problems, which caused him to be expelled from school. At the time of the trial, he was attending an alternative school. Ms. Simmons believed that the termination proceedings were causing Aidan to feel anxiety, and she believed that it was in Aidan's best interest for Mother's parental rights to be terminated so that Aidan could have some closure and the opportunity to be adopted.

The trial concluded on July 17, 2020, and in a written order entered on November 2, 2020, the trial court ruled that DCS proved three grounds for termination of Mother's parental rights: (1) substantial noncompliance with the permanency plan, (2) abandonment by wanton disregard, and (3) failure to manifest a willingness or ability to assume custody. The trial court also found that termination of Mother's rights was in the Children's best interests because of, *inter alia,* "her lack of visitation or concern about visitation, . . . her lack of contact trying to maintain a relationship with these boys, . . . her ongoing criminal

issues[,] . . . her drug use and her failed follow-through with recommended drug abuse and mental health treatment." This appeal followed.

## ISSUES

Mother identified eleven issues for our review, six in her "Statement of the Issues" and five more in a "Statement of Additional Issues."[8] DCS presents three issues for review. We have determined the dispositive issues are:

1. Whether clear and convincing evidence of any statutory grounds supports the trial court's decision to terminate Mother's parental rights.
2. Whether clear and convincing evidence supports the trial court's finding that termination was in the Children's best interest.

## STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016). However, that right is not absolute and may be terminated in certain circumstances. *In re Carrington H.*, 483 S.W.3d at 522. The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004).

In order to terminate parental rights, a trial court must find by clear and convincing evidence that at least one statutory ground for termination of parental rights has been established and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c). "Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence[,]" *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (quotation omitted), and which "produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established," *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

---

[8] As a preliminary matter, we note that one of Mother's "Additional Issues" is not an issue but an assertion of a post-judgment fact. It reads: "She has completed a welding apprenticeship program in Knox County and has been working as a welder since December 2020." This Court "do[es] not customarily consider evidence that has neither been presented to nor considered by the trial judge unless it has been made part of the record in accordance with Tenn. R. App. P. 14." *Kinard v. Kinard*, 986 S.W.2d 220, 227 (Tenn. Ct. App. 1998). Rule 14 provides that a party may submit a motion requesting this Court to consider post-judgment facts "capable of ready demonstration, affecting the positions of the parties or the subject matter of the action," and that we "may grant or deny the motion in whole or in part and subject to such conditions as [we] may deem proper." Tenn. R. App. P. 14(a), (b). As Mother has made no such motion, we will not consider any post-judgment facts.

On appeal, we review a trial court's findings of fact de novo upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); *In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017). However, the heightened burden of proof in termination proceedings requires this Court to make its own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524. A trial court's ruling regarding whether the evidence sufficiently supports termination is a conclusion of law that we review de novo with no presumption of correctness. *In re Gabriella D.*, 531 S.W.3d at 680.

**ANALYSIS**

**I. GROUNDS FOR TERMINATION**

The trial court determined that the evidence clearly and convincingly established three statutory grounds upon which Mother's parental rights could be terminated. This court is required to review, *inter alia*, the trial court's findings as to each ground. *See In re Carrington H.*, 483 S.W.3d at 525. Thus, we will address each ground in turn.

**A. Substantial Noncompliance with the Permanency Plan**

Permanency plans are developed for each child in foster care and set forth the "responsibilities between the parents, the agency and the caseworker[s,]" with the goal of attaining a permanent living situation for the child. Tenn. Code Ann. § 37-2-403(2)(A). A parent's rights may be terminated if "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan." *Id.* § 36-1-113(g)(2). In order to terminate a parent's parental rights under this ground, the plan's requirements must be "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)).

In the order terminating Mother's parental rights, the trial court found that Mother's responsibilities under the plans "were all reasonably related to the reasons that necessitated foster care and in the best interests of the children" and Mother does not challenge this finding. Thus, it has been established that the plan's requirements are "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *Id*.

Mother contends the permanency plans should be considered "void by operation of law" because the juvenile court did not ratify the permanency plan created on March 22, 2017, within 60 calendar days. We disagree. As we have explained:

[T]he requirement contained in Tennessee Code Annotated § 37-2-

403[(a)(2)(A)], directing the juvenile court to ratify the permanency plan within sixty days, is "directory and not mandatory." *In re A.W.*, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003). Ergo, a permanency plan that is not ratified within this timeframe is not considered a nullity. *Id.*

*In re Dustin L.*, No. E2015-02265-COA-R3-PT, 2016 WL 5416333, at *1 n.2 (Tenn. Ct. App. Sept. 28, 2016); *e.g. In re K.S.*, No. E2018-02274-COA-R3-PT, 2019 WL 3526384, at *8 (Tenn. Ct. App. Aug. 2, 2019); *In re Dravyn L.D.*, No. M2009-00357-COA-R3-PT, 2010 WL 681344, at *4 (Tenn. Ct. App. Feb. 25, 2010); *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *17 (Tenn. Ct. App. Mar. 2, 2009). Accordingly, we shall proceed to consider whether Mother failed to substantially comply with the permanency plan.

We note that Mother does not argue that she was unaware of the conditions placed upon her. In fact, Mother reviewed the requirements with Ms. Ridgell, her DCS caseworker, on June 22, 2018, and Mother was represented by counsel throughout these proceedings and never objected to the applicability or reasonableness of the plans.

Mother did not maintain contact with DCS case workers as the plan required, and she did not inform DCS of her move from Knoxville to Maryville. Though Mother had asked that Ms. Ridgell communicate with her by email or text message (for her "personal safety") rather than by a phone call, when Ms. Ridgell emailed and texted Mother, as requested, she often received no reply to her emails or text messages.

Mother attended few CFTMs and no Foster Care Review Board meetings. Moreover, Mother participated in only two of six meetings scheduled with DCS between May 2019 and trial. When Mother did participate, Ms. Ridgell described Mother as combative, which made it difficult to do case management with her.

Mother failed to complete any mental health requirements. Mother participated in alcohol and drug assessments but did not follow through with the required intensive outpatient treatment to address her mental health issues and substance abuse, nor did she attend parenting classes. Additionally, she did not obtain a sober sponsor, she continued to test positive for illegal substances, sometimes she refused drug testing altogether, and continued to deny using methamphetamine even after a having a hair follicle test positive for the substance. Mother misrepresented to DCS that she attended treatment at Susannah's House, when she, in fact, had failed to return for orientation and treatment following the initial intake assessment. Indeed, Mother provided no documentation that she completed any treatment at all for mental health or drug issues, and DCS was unable to substantiate her claims. Mother also failed to complete a parenting course.

Mother had a history of substance and alcohol abuse and for these reasons she was required to participate in an alcohol and drug assessment and follow all recommendations.

- 10 -

She testified that she had smoked marijuana since she was 14 years old, and that she "chose to medicate [her]self." She had multiple positive drug screens for methamphetamine, amphetamine, and THC while the Children were in foster care. Mother recognized that she made poor choices. That recognition, however, did not result in Mother completing drug treatment or complying with the other requirements that would enable her to regain custody of the Children.

Mother failed to obtain and maintain adequate or appropriate housing. For example, Mother's apartment in Knoxville was deemed inappropriate for the Children due to the lack of food and lack of an appropriate area for the Children to sleep.

Although Mother was employed at the time of trial, she failed to maintain employment as required by the permanency plan. Moreover, when she was employed, she did not pay child support and was 18 months in arrears at the time of trial.

Mother did not maintain regular visitation with the Children.[9] She told DCS that she would no longer visit the Children due to her fear of being arrested. The last time Mother visited the Children was in January 2019. Ms. Ridgell attempted to set up a meeting with Mother and the Children's Guardian ad Litem to work toward reinstatement of visitation, but Mother never committed to a time.

The evidence in the record preponderates in favor of the trial court's findings of fact and those facts amount to clear and convincing evidence that Mother was substantially noncompliant with her responsibilities under the permanency plans. Accordingly, we affirm the trial court's finding with respect to this ground.

### B. Abandonment by Incarcerated Parent—Wanton Disregard

Abandonment by conduct exhibiting wanton disregard is designated as a ground for terminating parental rights and is defined as follows:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or . . . during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration that exhibits wanton disregard for the welfare of the

---

[9] Mother asserts in her brief that "[DCS] blocked [her] from being able to see her children, then claim[ed] she failed to visit her children[.]" Mother does not cite to the record in support of this assertion, *see* Tenn. R. App. P. 27(a)(7)(A), and "[i]t is not incumbent upon this Court to sift through the record in order to find proof to substantiate the positions of the parties," *Roberts v. Blount Mem'l Hosp.*, 963 S.W.2d 744, 748 (Tenn. Ct. App. 1997), *abrogated on other grounds by Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73 (Tenn. 2001). Nonetheless, we have reviewed the record and find no support for Mother's assertion that DCS "blocked" her from visitation.

- 11 -

child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2019). "[A]ctions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). "[P]robation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867–68.[10]

> In her brief, Mother argues:
>
> [Mother] was incarcerated by Bradley County on February 7, 2019[,] for failure to appear. . . . The charge was not for any criminal behavior but was simply for failure to appear in Bradley County, TN. . . . [T]his does not rise to the level of wanton disregard for the care and maintenance of her children.

Mother misapprehends this statutory ground. At issue is not whether the particular offense for which Mother was incarcerated is itself one that shows wanton disregard for the Children's welfare, but, rather, whether her pre-incarceration conduct exhibited such wanton disregard. *See id.* at 866; Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2019). The incarceration itself—or the reason for it—is not dispositive of the issue; instead, it is "a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a *broader pattern of conduct* that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866 (emphasis added).

Mother was arrested on April 15, 2019, in Bradley County and remained incarcerated until June 3, 2019. Because Mother was incarcerated during part of the four months immediately preceding DCS's filing of the action on July 1, 2019, we proceed to take a closer look to determine whether the behavior that resulted in incarceration is part of a broader pattern of conduct that renders the Mother unfit or poses a risk of substantial harm to Payton and Aidan's welfare.

Mother has had repeated run-ins with law enforcement since the birth of the Children. She has had multiple arrests for public intoxication, DUI, possession of drugs and drug paraphernalia, and probation violations. In 2008, she pled guilty to two separate charges of assault. She was found guilty of DUI, possession of marijuana, and public

---

[10] Evidence relevant to this ground is not limited to the period immediately before the parent's incarceration. *In re Audrey S.*, 182 S.W.3d at 871.

intoxication in 2013. She was arrested in March of 2018 for possession of a schedule VI drug and possession of drug paraphernalia; she later pled guilty to those charges following her February 2019 arrest on those outstanding warrants, violation of her probation, and failure to appear in court. To make things worse, the Children witnessed that arrest. Furthermore, Ms. Ridgell testified that Payton was angry at Mother and told Aidan that he "knew this was happening because he could see the wear and tear on her teeth" and that the experience left Aidan "heartbroken, crying, very hard to console."

With respect to this ground, the trial court concluded:

> Since the children's births, [Mother]'s criminal activities have resulted in numerous arrests, convictions, violations of probation, and periods of incarceration, as evidenced by her certified criminal judgments and incarceration records, which were admitted into evidence. . . . Almost all indications are that she abandoned these children presumably because of drug use and her addictions, even though she was informed and knew it could lead to the termination of her parental rights.

The evidence in the record preponderates in favor of the trial court's findings of fact and supports the trial court's conclusions. Simply put, Mother's conduct, particularly her continued substance use and failure to get adequate treatment for it, reflects a "me first" attitude and exhibits indifference to the consequences of her actions to Payton and Aidan. *See In re Anthony R.*, 2015 WL 3611244, at *3.

For the foregoing reasons, we affirm the trial court's determination that DCS proved by clear and convincing evidence that Mother exhibited a wanton disregard for the Children. Accordingly, we affirm the trial court's ruling on this ground.

### C. Failure to Manifest a Willingness and Ability to Assume Custody

Tennessee Code Annotated § 36-1-113(g)(14) provides another ground for termination of parental rights. To establish this ground, two elements must be proven by clear and convincing evidence:

> (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

*In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). The Tennessee Supreme Court recently explained that "section 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian," and thus, the statute is satisfied when the petitioner establishes "by

- 13 -

clear and convincing proof that a parent or guardian has failed to manifest <u>either</u> ability or willingness[.]" *Id.* at 677.

Mother attributes this ground to "personal animosity" and "spite" on the part of DCS.[11] She states in her brief:

> The Department of Children's Services alleged [Mother] failed to manifest the ability to parent her children, so that they could out of personal animosity, assume the legal and physical custody of the children. There was a predetermined decision to block her from seeing and obtaining the custody of her children so that [DCS] could achieve a victory over her because she continued to assert her [c]onstitutional [r]ights to the end. . . . In this case they made no effort to assist the Mother with her transportation problems, except for giving her gas cards, that did not help her with the 2-hour drive one way to visit with her children. Nor did they offer any assistance with her communication problems. Her phone was dependent on wi-fi service and not reliable. There was obviously more they could have done to support this Mother, but refused to do so out of spite.

The record does not support Mother's assertion that DCS refused to help her out of spite. Moreover, whether DCS "could have done [more]" to help Mother than it did is not determinative to this ground.

Mother failed to "demonstrate[] [her] willingness by attempting to overcome the obstacles that prevent[ed] [her] from assuming custody or financial responsibility for the [Children]." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). She also failed to complete most of her steps of the permanency plan. She failed to visit the Children consistently and then stopped visiting altogether due to her fear of being arrested. She continued using illegal substances, as evidenced by DCS drug screenings, and has not made any significant progress toward treatment either for her drug use or mental health issues. She struggled to remain employed and has failed to provide for the Children financially. She is behind on her required child support payments that collectively amounted to $100 per month, a small amount in comparison to the actual real cost of raising children. Taken together, it is evident that Mother failed to manifest an ability or willingness to assume custody or financial responsibility of the children. Therefore, DCS satisfied the first requirement in Tennessee Code Annotated § 36-1-113(g)(14).

---

[11] She also cites Tennessee Code Annotated § 36-1-102(1)(A), the statute on abandonment, which is inapplicable to this ground.

- 14 -

With regard to the second prong of § 36-1-113(g)(14), whether returning the children to Mother's custody "would pose a risk of substantial harm" to the children, the trial court held:

> Placing the children in [Mother's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the children. [Mother] has continued to struggle with substance abuse and mental health issues throughout this custodial episode. She has not provided [DCS] with proof of completion of any treatment program to date. She has not visited the children since January 2019, and has taken no steps to have her visitation and contact with the children reinstated by the Court. The children are making progress in their respective placements and are working towards stabilization. It would be detrimental to reintroduce Ms. Gervais into their lives at this time, considering she has done very little to remedy the conditions that caused the children to enter foster care.

The evidence preponderates in favor of the trial court's findings and clearly and convincingly proves that Mother has failed to show an ability to provide a stable home life or necessary care for the children over a sustained period of time, and her continued substance abuse would put the Children at substantial risk of both physical and psychological harm.

Because, DCS established both prongs of Tennessee Code Annotated § 36-1-113(g)(14) by clear and convincing evidence, we affirm the trial court's determination that this ground was proven.

Having found that grounds exist for terminating Mother's parental rights, we will consider the Children's best interests pursuant to the relevant factors in Tennessee Code Annotated § 36-1-113(i).

## II. THE CHILDREN'S BEST INTERESTS

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. *In re Bernard T.*, 319 S.W.3d 586, 606 (Tenn. 2010); Tenn. Code Ann. § 36-1-113(c). While the combined weight of the evidence must meet the clear and convincing standard, facts considered in the best-interest analysis need be proven only "by a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). "The child's best interests must be viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. "In all cases, when the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child[.]" Tenn. Code Ann. § 36-1-101(d). Tennessee Code Annotated § 36-

1-113(i) sets forth nine factors for the court to consider in determining whether termination is in the best interest of a child.[12] "[T]his list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. Aug. 11, 2005).

The trial court made specific findings regarding seven of the nine best interest factors, which we discuss below.[13]

> (1) Whether the parent . . . has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent . . . [.] Tenn. Code Ann. § 36-1-113(i)(1) (2019).

The trial court found that Mother failed to make any significant progress on the permanency plan since the Children entered foster care in 2017. Specifically, it found that although Mother participated in alcohol, drug, and mental health assessments, she did not complete the prescribed treatment, and she continued to test positive for methamphetamines, amphetamines, and THC while the Children were in DCS custody. The trial court further found that Mother "has been unable to obtain the stability necessary to care for the children and has not demonstrated that she has safe and appropriate housing for the children."

Thus, the court found that factor one weighed in favor of termination of Mother's parental rights, and the evidence does not preponderate against the trial court's finding.

> (2) Whether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible[.] Tenn. Code Ann. § 36-1-113(i)(2) (2019).

The trial court found that Mother did not make lasting changes in her lifestyle or conduct after reasonable efforts were made by DCS to help her. It found that DCS made multiple referrals on Mother's behalf and provided her with resources to assist her in completing her responsibilities under the permanency plan; however, despite its efforts, Mother continued to struggle with substance abuse, mental health issues, and general instability. Notably, the trial court found, "she has not followed treatment

---

[12] The Tennessee General Assembly amended the statutory best-interest factors in 2021. *See* 2021 Tenn. Laws Pub. Ch. 190 (S.B. 205), eff. April 22, 2021. The factors applicable to this appeal are those identified in Tenn. Code Ann. § 36-1-113(i) (2019), which were in effect when the termination petition was filed on July 1, 2019.

[13] The trial court made no findings regarding factors 5 and 6 and we have concluded they are not relevant; thus, they are not discussed.

- 16 -

recommendations to date." Thus, the court found that factor two weighed in favor of termination of Mother's parental rights, and the evidence does not preponderate against the trial court's finding.

> (3) Whether the parent . . . has maintained regular visitation or other contact with the child[.] Tenn. Code Ann. § 36-1-113(i)(3) (2019).

The trial court found that Mother had not visited the Children since January of 2019 and that she had taken no steps to have visitation and contact with the Children, and the evidence does not preponderate against these findings.

> (4) Whether a meaningful relationship has otherwise been established between the parent . . . and the child[.] Tenn. Code Ann. § 36-1-113(i)(4) (2019).

The trial court found "there is no meaningful relationship between Mother and the children. While there may be a mutual love between the children and [Mother], there does not appear to be a meaningful parent/child relationship." The evidence does not preponderate against this finding.

. . .

> (7) Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent . . . consistently unable to care for the child in a safe and stable manner[.] Tenn. Code Ann. § 36-1-113(i)(7) (2019).

The trial court found "there is crime in [Mother's] home. [Mother] has continued to engage in criminal activities throughout this custodial episode, as evidenced by her criminal judgments and incarceration records." Although there is no evidence about the physical environment of Mother's home in Maryville, where she moved from Knoxville, the evidence preponderates in favor of the finding that there is criminal activity where Mother resides due to her use of controlled substances or controlled substance analogues, which render Mother to be consistently unable to care for the Children in a safe and stable manner. Thus, the evidence does not preponderate against the trial court's finding as to this factor.

> (8) Whether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child[.] Tenn. Code Ann. § 36-1-113(i)(8) (2019).

The trial court found that "[Mother] continues to struggle with mental health issues

and has not provided [DCS] with proof of mental health treatment to date." It also found that her mental or emotional state would be detrimental to the children and/or would prevent her from effectively parenting the children," and the evidence does not preponderate against these findings.

> (9) Whether the parent . . . has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101. Tenn. Code Ann. § 36-1-113(i)(9) (2019).

The trial court found that Mother has not paid child support consistently. The record reveals that Mother has a substantial child support arrearage, that the last two payments were accomplished by garnishments, and there remains an arrearage that exceeds 18 months of unpaid child support. Thus, the evidence does not preponderate against the trial court's finding that factor nine favors termination.

Based on its analysis of the relevant factors, the trial court concluded that it was in the Children's best interests for Mother's parental rights to be terminated. Having determined the facts as found by the trial court are supported by a preponderance of the evidence and that the combined weight of the evidence satisfies the clear and convincing standard of proof, *see In re Kaliyah S.*, 455 S.W.3d at 555, we affirm the trial court's determination that it is in the best interests of the Children to terminate Mother's parental rights.

### III.  TERMINATION OF MOTHER'S PARENTAL RIGHTS

"To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child[ren]'s best interest." *In re Valentine*, 79 S.W.3d at 546 (citing Tenn. Code Ann. § 36-1-113(c)). Having affirmed the trial court's determination that at least one statutory ground for termination has been proven and that termination of Mother's parental rights is in the best interest of the Children, we affirm the termination of Mother's parental rights as to Payton and Aidan.

### IN CONCLUSION

The judgment of the trial court is affirmed.  Costs of this appeal are assessed against the appellant, Dana G., for which execution may issue if necessary.

_____
FRANK G. CLEMENT, JR., P.J., M.S.